Good morning, your honors. May it please the court. My name is Thomas Otake. I'm the attorney for Reverend Roger Christie, who is actually present in court today in the front row. Also present with him is his wife and co-defendant, Sherryanne Christie. As you know, Ms. Christie is represented by Ms. Georgia McMillan. And as you also know, we submitted joint briefs in this case. And so we will be dividing up the time equally, 10 and 10. And we've also divided up the issues. I'll be taking the lead on the RFRA motion. Ms. McMillan will be taking the lead on the scheduling issue. We'd like to, given the shortness of time we have, we'd like to rest on our briefs as to the suppression and vagueness issues. However, if you have questions on the suppression issue, I'd be happy to try and answer them. And if you have questions about the vagueness issue, Ms. McMillan would be happy to try and answer those. Keep in mind your allocation of time is aspirational. Sometimes our questions will derail your... Understood. We'll try our best. And I'd like to also try to reserve a minute or so for possible rebuttal. So I'll start with the RFRA issue. And as the court is well aware, the starting point for this is that Judge Kobayashi ruled in no uncertain terms that Reverend Christie had a sincere belief in a legitimate religion, and that belief was substantially burdened by this prosecution. That was something that then shifted the burden on the RFRA to the government to show they had a compelling interest and that this was the least restrictive means. Now, as the court is aware, that test, that strict scrutiny test, it's the highest test under constitutional law. And we believe that Judge Kobayashi got it wrong when she said, number one, there was a compelling interest, and number two, that this was the least restrictive means, meaning... Well, it's not always fatal, is it, counsel? I mean, there are instances where the test can be met. Absolutely. In other words, just because we slap a label on it that says strict scrutiny applies doesn't end the analysis. Absolutely not. And, for example, in the LEP case, the District Court of Northern California ruled that strict scrutiny was met. When you're talking about 24,000 plants in a two-acre field that's accessible to the public, clearly there was this risk of diversion and an interest... And that, I think, is what the District Court focused upon. Absolutely. You know, I mean, one of the biggest bad facts that you have here is the express service and the large numbers of plants that we're talking about and the fact that there was no effort made with regard to some of the purchasers that had anything to do with enrolling them as members of the church. And what's your response with regard to the diversion? I'm happy you brought that up because I think that's important, is that we focus in on what the court ruled was the compelling interest. And as we know, it wasn't the enforcement of the CSA generally. O-Central teaches us that's not a compelling interest, but we know that... Well, it is with respect to preventing diversion. Specifically with respect to preventing diversion, and more specifically under O-Central, in the context of this case, not diversion generally, but the context of this case. Well, I mean, I think the District Court recognized that. I mean, here, you know, there was a breakdown in essence in the enrollment system. There was a failure to verify that the people who presented themselves at the door were actually the people who had enrolled in the church. And then you've got the problems of people who were signing up over the Internet. Right, and if I could address that. But again, that is the compelling interest the District Court found, the risk of diversion through EXPRESS. I'll point out that this EXPRESS... So is that a factual finding to which we defer, unless you can convince us that it's clearly erroneous? Her finding that there was... Well, our position is that the court should review this de novo. Even the facts? Well, the finding, I think the... I mean, she held an evidentiary hearing, did she not? There was an evidentiary hearing. Can you cite me a case that says the Court of Appeals can reweigh the facts as determined by the District Court and de novo and reach a different conclusion? Well, even under a different standard, we would submit that her finding was erroneous. Why? How? I'll explain why. What compels the opposite result? Okay. First of all, when you look at the EXPRESS procedure, I want to make it really clear that that was implemented nine years into this ministry. And secondly, the comment about... The problem is that if there is diversion and if it was occurring for some period of time, even though the ministry existed for nine years, that doesn't insulate the defendants from prosecution. I'm not suggesting it does. I'm just... Well, Central talks about how context matters, and so that's the context in which it occurred. Now, as to the Internet distribution of the sanctuary kits, the record is clear that those kits were mailed primarily out of state and that the people coming to use the EXPRESS procedure lived in Hilo, the small town, and to get their membership, they had met personally with Reverend Christie. Mr. Otake, it seems to me that that hurts your position. In essence, it's a lessening of control in order to ensure that the controlled substance is being used for a permissible purpose, in other words, for the practice of religion. Instead, it begins to look more like religion being used as a cover for drug dealing. The reason why it's important is because to suggest that somehow the Internet mail-outs of the sanctuary kits facilitated diversion through the EXPRESS procedure is just factually not true because... That this never occurred? No. Those kits were never mailed? They were, but they were never mailed out of Hilo. And are you asking us... Again, I've got findings from the district court. Right, and I believe those findings, in terms of what's supported in the record, is that the sanctuary kits were mailed to people out of town and that the local people in Hilo were required to meet with... Well, let's just deal with the sanctuary kits. I mean, again, I think that's a hard fact for the defense to overcome because there's clearly no effort made at that point. There's no face-to-face meeting with Reverend Christie. There's no... Right. I mean, somebody just dials in on the Internet and back in the mail comes... No, but the sanctuary kits, I guess that's my point, right, is the sanctuary kits, the people who received those were not the people using the EXPRESS procedure, which Kobayashi found was the one that led to diversion. The EXPRESS procedure presents a different problem. Right, and that's the problem that Judge Kobayashi said... Well, I thought she cited to both when she talked about diversion. That's how I read her order. My understanding, Your Honor, respectfully, is that her finding was the risk of diversion came from the EXPRESS procedure. I'd like to maybe shift... Before you go on, I'd like to answer Judge Tallman's question. Sure. The district judge made some findings. To what degree do we give deference to those evidentiary findings with respect to the EXPRESS program? Well, I mean, you know, obviously the appeals court needs to give deference to credibility findings. What level of deference? You know, that's... It's an important point, as you know. So what about clear error? If you're talking about credibility findings, then yes, it would be clear error. But in terms of the other issues before the court, in terms of her legal conclusion... We're not talking about legal. We're talking about factual. You're talking about the factual, right? The evidentiary hearing results, right? Right. I mean, in terms of those findings related to credibility and factual findings, it would be clear error. Right. But we would also say, if you look at the other cases that have addressed these RFRA issues, they have done de novo reviews on the court's findings. While we're on RFRA, let me ask you, did the trial court make an assumption that RFRA applied because the claim is based on... It's rooted in religious belief and that the beliefs are sincerely held? Were there any hearings on that issue? There were. There were multiple... Well, there was a lot of evidence submitted through the declarations of Reverend Christie and Chair Christie and an expert in religion, Dr. Lori Kozad, that the court relied on to make a finding that there was this sincere belief in a legitimate religion. And if the courts would allow me, I'd like to speak on the least restrictive means test, at least in the time I have left, because when you look at that test, and the Hobby Lobby case is a case that recently, obviously, the Supreme Court said the government didn't meet the least restrictive means. So if the court believes there was a compelling interest, our position is that clearly federal prosecution with this statute that enforces a five-year mandatory minimum was not the least restrictive means. When you have, again, the ministry operating for nine years without this express procedure in place, when you have Reverend Christie being open and obvious in his dealings with law enforcement and his contacts with law enforcement, there were other means to get him to stop... What does the record tell us about your willingness or not to abandon the express service? I would say the record supports clearly that that's something if anybody had reached out to him and said, hey, we have a problem with that, and we need to throttle that back, the record supports that's something he'd be willing to do. He met regularly with local law enforcement. He met with a U.S. attorney at the time here, Mr. Edward Kubuch. He met with the DA agents. Was there a finding on that particular issue? Well, there was. Again, when you look at it, it's the government's burden to show with evidence that that would not have been the case. And I don't believe the judge specifically... That what would not have... That he wouldn't... No, that these other... That he would have stopped doing it if they brought it to his attention. It's the government's burden to show that other least restrictive means would not have been viable. The problem, I think, fundamentally with your argument, because of the diversion concerned by the district court, is that unlike Ocentro, we don't have careful use of the substance confined to religious ceremonies. And when marijuana is being distributed through the mails to out-of-state people where there are lax efforts to confirm membership before the sales are made, there's nothing here that even looks like the semblance that that use is for religious purposes. But marijuana was never distributed through the mail. Absolutely not. I thought there was something about cuttings. Absolutely not. The sanctuary kit contained... Which is a lower grade of marijuana? No. You're probably talking about what's called shake, which was given out as aloha bags. Aloha bags, yeah, the aloha. That was given out in the clinic. But I understand, and I respectfully would submit, and I don't think the government disagrees. There's no evidence it was ever... My recollection is that the biggest problem with the express program was in Hilo itself, where you had people who were coming, I guess you'd call it the sanctuary. You didn't have people checking for whether they had cards, whether they were members, whether they were able to buy things. And therein lies the problem. That's what the district court relied on to say there was this compelling interest. And that's where we have, not the legal part, but the factual part. When you go to the least restrictive means, you know, clearly the federal constitution... What are the least restrictive means? Well, given everything in the record about how Reverend Christie met with law enforcement regularly, was open about the way he did things, he had a banner outside his place saying that we use cannabis religiously. And the fact that he ran for mayor, he was always testifying in front of the county council, he was always reaching out to local law enforcement. And in the record, you know, there's evidence that he was there telling them, hey, is what we're doing okay? And for nine years, nobody told him otherwise. So the record supports that a lesser restrictive means of anybody going to him from law enforcement and saying, hey, you need to stop this express procedure would have worked. And one last comment, and I'd like to just save time for my co-counsel. I cannot see how anybody can say, and I'm saying this, I'm not Sheriff Chris's attorney, but obviously it's near and dear to my client's heart because that's his wife. I don't understand how anybody can say that it's the least restrictive means to prosecute her. I don't see how you can say that. Did she take over the operation when he was injured? For a month, for a month. I mean, the problem is if she's doing the same thing that he's guilty of, and if he doesn't have a legitimate RFRA defense to that claim, that doesn't make her any less. I mean, it may be less culpable in the sense that it was for a shorter period of time, but it's still a violation of the law. If you look at the government's burden to show that the least restrictive means to get to this compelling interest, the compelling interest being diversion through the express procedure, I don't see how the record supports that had they charged only Roger, and I'm not saying they should have done that, I don't see how the record supports that Sheriff would have said, hey, my husband's under federal prosecution. I'm going to just continue this express procedure. I don't think the record supports that. So clearly that was not the least restrictive means. Are you saying that your client is entitled to in effect one bite at the apple? I'm suggesting that the government has the burden of showing that their means of dealing with this compelling interest was done through the least restrictive means, which has been described by the Supreme Court as an extremely high burden for the government to show. If they find there's a violation using the express program and they prosecute, you're saying, well, you can't do that because you really needed to talk to us about whether we'd stop doing that and then we'll do something else. Well, and see, that's, you know, I'm going to run out of time here, but real quick, that's an important point. I'm not saying that they should have, that's what's interesting about RFRA. When there's a preliminary injunction, you have the opportunity to have that conversation ahead of time. When the government goes straight to prosecution through indictment, there's no opportunity for that notice, and I'm not saying that the law requires that, but I'm saying what then happens is the court is then tasked with, after the fact, having that conversation and saying, well, the government did or did not meet their burden, and in this case, that's what happened. They were indicted. There wasn't an opportunity for that conversation. I'm not saying there was a need for notice under RFRA, but what triggers then is this court procedure where we file this motion and the court then has to do this analysis after the fact, in which case, when you do the analysis, the government has not met their strict scrutiny test and not fulfilled their burden. So thank you very much for your time. Thank you, counsel. Again, I'd also ask maybe she can have a little more time to it. I'm sorry. Because you took it all? Good morning, Your Honors. Georgia McMillan. I represent Mrs. Christie, Cherianne Christie, who is present in court. I would like to focus on the Fifth Amendment substantive due process issue and submit the vagueness issue on the briefs. I don't have any further comments on that unless, of course, the court has some questions. If there's any time left, I'd like to chime in and support Mr. Otakey's argument. So concerning the Fifth Amendment issue, there's three key points that I want to make. One is that our clients have standing to make this issue. The second point is that notwithstanding a prevailing case law, the court can decide this issue. And then the third point is that the lower court erred when it decided this motion to dismiss. It's your argument that we can somehow avoid the controlling decision in United States v. Mirohan? No, of course the court has to take that into account. Well, doesn't that resolve the substantive due process claim that you're raising as to the Schedule I classification? The answer is no. Why not? That case is from 1978, and even though those cases say that at that time the constitutional review of the court came up against the defendants, none of those cases, the Mirohan, Oakland Cannabis, White Plume, foreclosed the court's ability to once again look at this statute and consider new evidence. Well, we could do it in bank. The problem is that you're asking this three-judge panel to rule inconsistently with a 1978 three-judge panel, and I know you know this. We don't have the authority to do that. Are you making the argument to preserve it for the record? Is that why you're raising it? Well, we're raising it because in the history of this evolving use of marijuana, at some point the court should consider it because it looks like the DEA won't consider it. So your argument is times have changed and we should revisit it? Essentially, times have changed. But you understand that as a three-judge panel, we don't have that authority. Well, then we'd preserve it on bank. Yes. You're not trying to distinguish, Mirohan. You're simply saying it's wrong. We cannot distinguish it. Very well. But our position is that those cases do not foreclose the Ninth Circuit's review of the issue based on the evidence that was presented in this record. Very well. And concerning that evidence, we think that the lower court erred in the motion to dismiss. The lower court made no findings whatsoever in the motion to dismiss on these grounds. It based its conclusion on following those cases, the marijuana and the other cases, and it considered those cases to be dispositive of a factual issue. There was a hearing and defendants brought in an expert witness. His expertise was not questioned by the government. This was Dr. Webb's testimony. He testified concerning three key components for drugs listed on Schedule I, that they have a high potential for abuse, that there's no currently accepted medical use and treatment in the U.S., and that there's a lack of accepted safety for marijuana use under medical supervision. If you look in the record, it's appellant's record, the pages are anywhere from 420 to 440. You see the substance of Dr. Webb's testimony in which he says that after 30 years in an emergency room, he's never seen one case of abuse of marijuana. There is no lethal dose obtainable for marijuana. He's aware of no overdoses. With respect, I suppose many judges wish they had this power, but isn't your beef with the legislature, the people who enacted these laws in the first place? Don't you need to go to the legislature to change the controlled substances law? If times have indeed changed, and I'm not saying they haven't, you're asking us to overturn a three-judge panel decision, some Supreme Court law, and, of course, all kinds of cases. Even if we're totally in agreement with you, where do we get that authority? Well, when we read the government's brief, the government seeks to basically reshape the argument into a reclassification argument. The parties from the beginning, when they filed this motion to dismiss before the lower court, never sought reclassification. And, indeed, when the lower court judge- And that peyote versus marijuana issue, is that what you're talking about? No, there's a legion of cases that are set forth in the briefs that speak about reclassification. And, essentially, those decisions from across the country say that reclassification is not, the court system is not the venue for reclassification. There you have to go by the statutory framework that's set out. You don't want a reclassification. No, we're not seeking reclassification. You want a statutory exemption. That's what you really want. What we want is for the court to hold that listing marijuana in Schedule I is unconstitutional. That's what we're seeking, not the reclassification. Because if we're seeking reclassification, that argument is done. It's over. We're dead with that argument. Because the only resolution for that argument is to go by the statutory modification procedure that's set up. Thank you, Counsel. Your time has expired for your side. We'll hear from the government. May it please the Court. John Pelletieri from the Department of Justice on behalf of the United States. I'd like to clarify a couple of things first about the scope of the district court's ruling and then also answer some questions about the standard of review and then go a little bit into the record about diversion and tailoring. Regarding the scope of the district court's decision, there was no final determination as to whether the defendants carried their burden under RFRA. Under RFRA, the government can't substantially burden a defendant's exercise of religion unless the government shows that there's a compelling government interest and that the imposition of the burden is narrowly tailored to serve that government interest. Counsel, I wonder if the district court didn't simply assume without making specific findings. Is that your condition? That's absolutely what the court did. This court has held that the defendant or the person claiming a RFRA claim or defense has to first bear the burden of making a four-part showing. The claimant has to first articulate the scope of his or her beliefs. Second, the claimant has to show that those beliefs are religious rather than purely secular. Third, the claimant has to prove that those religious beliefs are sincerely held. And then, four, the claimant has to show that the imposition of the government has imposed a burden on the exercise of those religious beliefs. So when I asked Mr. Otake about whether findings were made with respect to those preliminary questions, he seemed to think that, yes, there were. evidentiary hearing findings. I gather you disagree with Mr. Otake. Yes, we do disagree. The court did find on the first prong that the Christies had articulated the scope of their beliefs. But then on the second prong as to whether those beliefs were religious, the court specifically said that I'm going to assume for purposes of this motion only that those beliefs are religious without deciding it. And then the courts did specifically say, I'm also going to assume for purposes of this motion only that those religious beliefs were sincerely held. And then on the basis of those assumptions, the court concluded that the Christies' religious beliefs were burdened by the prosecution. Now, are these particular points you're making for us at this stage? They're not. Well, certainly not the sincerely held religious belief, because that's a factual finding that only the district court can make. It's really a credibility determination. Which is simply assumed in this case. Which is simply assumed in this case. But we're past that now. We can't send it back specifically for a finding on RFRA unless that issue has been preserved in some way. And does the scope of the plea agreement here only preserve the ability to dispute or raise the compelling interest and narrow tailoring aspect? And this court has in Lafley essentially sanctioned what the district court did, assuming that the claimant made the burden, and then allowing the district court to rule on the compelling interest and tailoring aspect, and then in Lafley affirmed on that ground. So, yes, we're here talking about the compelling interest and the tailoring. I just wanted to clarify the scope of the district court's decision. Now, regarding the scope of review, the court had some questions about that. And the court reviews the compelling interest and narrow tailoring determination de novo, but findings of historical fact that the district court made in the course of making its determination are reviewed for clear error. And I think that just in terms of a helpful discussion of this, Judge McConnell's decision in the Tenth Circuit, and I believe the Friday or the Wilgus case really goes into depth about this. So we're talking about de novo, but historical fact is reviewed for clear error. And I'd like to talk. My concern with the government's case at this point is the narrow tailoring, and I want to get right to the question of what was the status of, what does the record tell us in terms of the offer to abandon or very seriously cut back the express portion, the express service? And why wouldn't, if that offer had been made, why wouldn't that have met the narrow tailoring requirement? Well, the narrow tailoring requirement doesn't require the government, when enforcing a criminal prohibition, to provide prior notice or outreach or things of that sort. And that is what this Court has found in the Vasquez-Ramos case and what the Tenth Circuit found in the Friday case. So, for example, in the Vasquez-Ramos case, it would be in tension with the finding that there's a need for notice because what happened was the defendant there said, well, the government needs to make more efforts to get more eagles in this repository because there's a law saying you can't possess any kind of eagle parts or hunt eagles, but you can apply for it. The government has this repository which it goes and mails out eagle parts, and there's also a permitting process. And the claimant there said, well, the government needs to get more eagles in this repository because we have this big wait list. And so by enforcing this eagle prohibition and not doing more to make more eagles in this repository, it wasn't narrowly tailored. The enforcement of the criminal prohibition was not narrowly tailored. And this Court specifically said that the narrow tailoring inquiry is in terms of and considered in terms of what the government can and cannot do, not what the claimant can extract from the government. And so that holding in that case is directly in tension with any kind of suggestion that the government was required to provide any kind of notice in this case and kind of ask him to tail back his distribution practices. If they offer it, which apparently we hear today they said they did, doesn't that put the government in a position of at least having to see if that would meet the diversion concerns, which, of course, underlie this whole case? Well, criminal prohibitions are necessarily backward-looking in terms of conduct that occurred in the past and sanctions for that conduct. This is not a case where we're applying RFRA to an ongoing obligation. So I think it's a little bit different than, for example, the Hobby Lobby case, where we're talking about a corporation's ongoing obligation to provide certain types of health insurance to their employees. And as has been discussed, the substantial, the compelling interest and the narrowly tailoring standard are contextual and context-dependent. And so here it's very different when you apply it to a backward-looking criminal prohibition. In that case, you look back to alternatives that the government could have, that are potentially available, not to whether in the future we could ask them to provide notice or we could give notice and ask them not to do that. So in this case, and also the record really is directly contradicting any kind of suggestion that there would be a pullback on the type of distribution activity that occurred here, and in addition expresses not the only basis for the diversion concerns in this case. And I'd like to go through some of those. Before you do that, I just want to be sure we're on the same page. Under O-Centro, the Supreme Court made it clear that making certain that the risk of diversion was avoided or could be, and our case law, at least unpublished case laws, adopted that, of course. Then the question is, what is the least restrictive means of protecting that interest? How do you do that in a criminal context? The opposing counsel have said, well, here we've been real open. We've told you all of this, and now all of a sudden you come and prosecute us. Why didn't you talk to us first? I know it's very different than the normal criminal approach, but if that's not the way you do it, then how do you do it? Is it a gotcha game or what is it? Well, as I said, that kind of requirement or the notion that the government is required to take that kind of affirmative action prior to pursuing criminal prosecutions. I agree it's strange, but we've got this statute that has kind of changed things a bit. It's strange, and it's been rejected by this Court in the Tenth Circuit, and we believe it should be rejected in this case. The Eagle case, right? The Eagle case, and in the Tenth Circuit, for example, there was, as I mentioned, there's this prohibition against hunting eagles and possessing eagles. This is the Friday case. And as I mentioned, there's a repository and there's also a permitting process. Someone can go and apply for a permit to go hunting. And the defendant in that case said, well, I didn't know about this permitting process. So the government should be required to publicize it more thoroughly. And the Court of Appeals there, the Tenth Circuit, said, no, that's not a least restrictive means. It's not a matter of requiring. We're not aware of any First Amendment or RFRA case requiring the government to take that kind of affirmative step and to engage in that kind of affirmative conduct before pursuing a criminal case in violation of a criminal statute. Did we review whether the least restrictive means conclusions in this case, do we review that de novo? Yes, unless a component of it is a finding of historical fact. But, yes, you review it de novo. And the government doesn't have to prove every, basically prove a negative here and say that, you know, the government needs to, we need to justify our, the scope of our prohibition and then rebut the potential alternatives offered by the defendants. And here they offer four. One is notice, we talked about that. Another is basically including marijuana in some kind of peyote-like regulatory scheme. And that is fully unreal. It would not serve the government's interest in light of these very important differences between peyote and the general use and market for peyote and marijuana. I gather that until the ministry started the EXPRESS program, the government really was not in a position to complain very much. Is that a fair statement? We disagree. And I'd like to, even before the EXPRESS, Mr. Christie's stated view is cannabis should be liberated and that it's beneficial to health, mental and physical health, and it should be available to anyone and everyone who wants it. We have a RFRA assumption here by the trial court that this is a valid religion and RFRA applies, and so we're stuck with that. Yes, but if you look at the nature of the beliefs and the implication of those beliefs for the conduct that they want an exemption for, it's basically a belief that everyone should have access to marijuana and I should be able to provide marijuana to anyone who wants access to it. Well, the government didn't prosecute until the EXPRESS program came into effect. Is that right? The investigation commenced prior to the EXPRESS procedure. Okay, but you didn't prosecute. And we did not, and then we pursued charges after the EXPRESS procedure. Okay, and didn't those charges primarily sound in the concept that this really was anybody could get it? It doesn't matter whether you had a card, whether you've ever talked to Irving Christie or anything like that. You could just go there, show up, buy it, you're on your way. Yes, and that was prior to EXPRESS, and let me tell you the record support for that. Prior to EXPRESS, an undercover agent was introduced to Mr. Christie. Mr. Christie explained that the THC ministry is a defense to prosecution. He explained his role in the kind of activism and liberating marijuana. He didn't describe any of the religious tenets of the THC ministry, and then the undercover officer purchased a sanctuary kit, gave him $250. Mr. Christie gave the undercover officer a card and said, here, now here's your protection to prosecution. And then he went on to sell him over $1,000 worth of marijuana. There was no notion that this undercover agent shared any of the beliefs of the THC ministry or was even informed of the beliefs of the THC ministry. And you can look at the, we've included in our supplemental excerpts of record, the transcript of that first meeting between Mr. Christie and the undercover agent. And in addition, so Mr. Christie prior to EXPRESS. Well, does that call for a finding of fact or a finding of law? Well, that is supported by the record, and there's really no dispute that that occurred. It's just a matter of the court, the district court did not make specific, the district court made a finding that there was a sale to an undercover agent. That's undisputed. And the district court did not go into any specific particular findings about the undercover agent. But this court can affirm and ground its analysis in anything supported by the record and on de novo review. Now, there's really no dispute about any of these underlying facts. It's the consequences that follow from those facts that are disputed,  Now, secondly, prior to this EXPRESS procedure, Mr. Christie would provide, sell marijuana to anyone who showed up and was given a card and made a donation of anything between $20 to $250. And the record supports, for example, and establishes that he would accommodate cruise ships that came to Hilo for the day. They would come in, he'd give them membership cards and sell them marijuana. There's no suggestion that those were any kind of practicing members, any kind of religious faith in the context of the THC ministry. And the record also establishes Mr. Christie's desire to eventually mail marijuana to people who were members anywhere in the world. Now, there's no proof that he mailed, there's proof that he mailed these tinctures and these oils that are infused with marijuana. And there's proof that he told people, well, these tinctures you can use to dose yourself in a restaurant or in the theater. But there's no proof that he's mailed, I guess you would call it, leaf marijuana in the mail to someone. But what's important here is the risk of diversion and the potential that this was a, this organization and the activity that Mr. Christie both engaged in and sought to engage in presented a really extreme substantial risk of diversion to non-adherents, people who are not in any way going to make use of this marijuana for religious purposes. What did the trial court do with respect to these incidents where you point out that there was fairly indiscriminate issuance of cards and distribution of marijuana? What findings did the court make with respect to those incidents? Well, the court made a finding that anyone can come into the ministry and was handed a card after they heard Mr. Christie provide some sort of information. The court didn't make a finding exactly about what information they obtained and that anyone could obtain these cards by mail and that anyone who showed up with a card was eligible and was sold marijuana without any kind of determination, questioning whether the individuals had any knowledge of any religious tenets of the THC ministry, let alone whether they had shared those beliefs and were using marijuana on a religious basis in conjunction with those beliefs. So the court did make those findings. And just to back up, as I mentioned, this court, it's a de novo review. To the extent the district court made factual findings, those are reviewed for clear error. To the extent there are facts in the record, there's evidence in the record, and there's really no dispute about what those facts say or are, then the court can take into account that evidence in the record when applying de novo review to determine whether the government has a substantial interest in avoiding debate. Well, what's bothering me, counsel, is this assumption that RFLA applies and this is the real religion. Are you suggesting that we have the power to examine that assumption and reach a different conclusion? I think the court, we haven't raised it, and there's at least an issue of appellate waiver, but the court obviously can overcome that in its discretion. But the court could, if it wanted to, could look to the first and second prongs of the burden, which are not factual findings, whether the Christies articulated the scope of their beliefs, and number two, whether those beliefs are religious, and that's something you'll hear about in the next appeal that's going to be argued. Those are, I believe that those are legal findings. They didn't require any kind of credibility determination, but the court would not be able to make a finding with regard to the third prong, which is sincerity, because that is a factual finding that requires a hearing, that requires, in essence, a credibility determination. And there's nothing in the record with respect to sincerity? Well, there's no finding with respect to sincerity. The court specifically said in its ruling, I am just assuming for purposes of this motion that they are sincere. And now there are some other statements saying the Christies established their prima facie case. There's a little bit of tension between that. There's a little bit of ambiguity, but I think you have to look to the more specific statements that trump the broader statements. The more specific statement couldn't be clearer. It says, I am assuming only for purposes of this refer motion that they are sincere. Thank you, Counselor. Your time has expired. The case just argued will be submitted for decision, and we will hear argument next in Oluweaha Native American Church v. Lynch.
judges: O'scannlain, Tallman, Smith